**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 22-1204**

---

THRIFTY PAYLESS, INC., D/B/A RITE AID,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

---

ON PETITION FOR REVIEW FROM THE DECISION AND ORDER OF THE
NATIONAL LABOR RELATIONS BOARD IN CASE NUMBER 20-CA-255252

---

**BRIEF OF PETITIONER**

---

Stephen M. Silvestri (Bar No. 55749)
Alana R. Glover (Bar No. 64534)
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, MD 21209
Telephone (410) 415-2000
Facsimile (410) 415-2001
Stephen.Silvestri@jacksonlewis.com
*Attorney for Petitioner,*
*Thrifty Payless, Inc. d/b/a Rite Aid*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW AND RELATED CASES

This Certificate is submitted by Thrifty Payless, Inc. d/b/a Rite Aid ("Petitioner") as directed by the Court's August 19, 2022, Order as a supplement to its Docketing Statement pursuant to Circuit Rule 15(c)(3).

**I.      Corporate Disclosure Statement.**

Pursuant to Circuit Rule 26.1 and to enable the members of this Court to evaluate possible disqualification or recusal, the undersigned counsel for Petitioner hereby states that Petitioner is a wholly owned subsidiary of Rite Aid Corporation, which is a publicly held corporation.

**II.      Parties and Amici.**

A.      Petitioner submits the following as a list of known parties appearing in this Court in this matter:

      National Labor Relations Board, Respondent

      Thrifty Payless, Inc. d/b/a Rite Aid, Petitioner

B.      Petitioner submits the following as a list of known intervenors appearing in this Court in this matter:

      United Food and Commercial Workers Local 8 – Golden State

C.      Petitioner submits the following as a list of known amici appearing in this Court in this matter:

      None.

## III.    Rulings Under Review.

The following rulings issued by the National Labor Relations Board are at issue in this matter:

> Thrifty Payless, Inc. d/b/a Rite Aid, Case No. 20-CA-255252, reported at 371 NLRB No. 124 (August 11, 2022).

## IV.    Related Cases.

This matter on review has not previously been before this Court or any other court.  The National Labor Relations Board has cross-petitioned for enforcement of the Board's decision.  That matter is pending in this Court as Case No. 22-1241.

# **TABLE OF CONTENTS**

GLOSSARY OF ABBRIEVIATIONS.................................................................1

JURISDICTION.................................................................................................2

STATUTES, RULES, OR REGULATIONS ......................................................3

STATEMENT OF ISSUES ................................................................................4

STATEMENT OF THE CASE...........................................................................5

STATEMENT OF FACTS .................................................................................5

     A.     History of the Fund and the Collective Bargaining Agreement ...........7

     B.     Segal Consulting's 2018 Report Showed the Fund Was Rapidly
Deteriorating and its Reserves Were Depleting....................................8

     C.     The Parties had Ten Bargaining Sessions over Twenty Months-All
Focused on the Fund. ............................................................................9

          1.     May 2018 - First Bargaining Session Two Months After Segal
Report......................................................................................10

          2.     September 20, 2018 – No Proposal and Union Representatives
opt to Golf Instead of Attending Bargaining Session..............12

          3.     October 4, 2018 – Union's First Formal Proposal with
Exorbitant Costs to Rite Aid....................................................13

          4.     November 5, 2018 – Union's Refusal to Submit a Cost Neutral
Proposal....................................................................................14

          5.     June 25, 2019 – After Five Months of Delay the Union
Submitted Yet Another Proposal with Exorbitant Costs to Rite
Aid...........................................................................................14

          6.     Extension Agreement Resulting in Substantial Additional Cost
to Rite Aid................................................................................16

          7.     August 12, 2019: Union Rejected all of Rite Aid's Proposed
Alternatives Based on Segal's Report. .....................................16

8.      August 16, 2019 – No Progress. ................................................17

9.      September 11, 2019 – Union Submitted a Proposal after Two Hours which demanded additional Increases from those in Prior Proposals. ..................................................................................18

10.     September 26, 2019 - No Movement from the Union and the Extension Agreement for Increased Contributions Expires with no meaningful improvement in the Fiscal Status of the Fund. .20

11.     October 25, 2019 – The Union continued to refuse to discuss movement to a Rite Aid Plan and Threated Further Financial Harm Against Rite Aid. ...........................................................21

12.     October 28, 2019 – Union Refused to Consider Rite Aid's Proposal. ...................................................................................21

13.     November 19, 2019 – Union Arrived at Session with No Proposal. ...................................................................................22

14.     December 5, 2019 - The Parties Were at Impasse and the Fund was on the Brink of Bankruptcy. ...............................................24

15.     Union Made Additional Threats of Economic Harm to Rite Aid at the Conclusion of December 5, 2019 Bargaining Session. ..25

16.     Unmistakable Declaration of Impasse and Implementation to Prevent Associates from Losing Healthcare. ...........................26

D.    The Board's Decision and Adoption of the ALJ's Determinations. ....27

SUMMARY OF THE ARGUMENT ....................................................35

STANDARD OF REVIEW ..................................................................36

ARGUMENT .......................................................................................37

I.    The ALJ Ignored Substantial and Uncontradicted Evidence Showing Economic Exigency Requiring Rite Aid to Implement its Final Proposal. .............................................................................37

II.      The Board's Determination That There Was No Valid Impasse Was
         Not Supported by Substantial Evidence and is Incorrect as a Matter of
         Law. .................................................................................................42

         1.      The Board Improperly Applied the Law and Improperly
                 Considered the Facts in the Record in its Application to
                 the Taft Factors. .............................................................44

III.     The Board Improperly Determined the Remedies Imposed on Rite Aid
         Under the Law. .................................................................................50

CONCLUSION ...........................................................................................53

CERTIFICATE OF COMPLIANCE .......................................................54

CERTIFICATE OF SERVICE ...............................................................55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AAA Motor Lines, Inc.*,
215 NLRB 793 (1974) ......................................................................42

*Allentown Mack Sales Serv., Inc. v. NLRB*,
522 U.S. 359 (1998)........................................................................36

*Bob's Tire Co. v. NLRB*,
980 F.3d 147 (2020)........................................................................50

*Bottom Line Enterprises*,
302 NLRB 3373 (1991) ..................................................................38

*CalMat Co.*,
331 NLRB 1084 (2000) ..................................................................45

*Circus Casinos, Inc. v. NLRB*,
961 F.3d 469 (D.C. Cir. 2020)...................................................36, 47

*Comau, Inc. v. Nat'l Labor Relations Bd.*,
671 F.3d 1232 (D.C. Cir. 2012).......................................................49

*ConAgra, Inc. v. NLRB*,
117 F.3d 1435 (D.C. Cir. 1997).......................................................49

*Erie Brush & Mfg. Corp. v. Nat'l Labor Relations Bd.*,
700 F.3d 17 (D.C. Cir. 2012)...........................................................49

*Grondorf, Field, Black & Co. v. NLRB*,
107 F.3d 882 (D.C. Cir. 1997).............................................50, 51, 52

*International Ass'n of Fire Fighters*,
304 N.L.R.B. 401 (1991) .................................................................37

*Jackson Hosp. Corp. v. NLRB*,
647 F.3d 1137 (D.C. Cir. 2011)...................................................36, 42

*Jochims v. NLRB*,
    480 F.3d 1161 (D.C. Cir. 2007) ........................................................... 36

*Laurel Bay Health & Rehabilitation Center v. NLRB*,
    666 F.3d 1365 (D.C.Cir.2012) ...................................... 33, 42, 43, 45, 47

*M&M Bldg. & Elec. Contractors, Inc.*,
    262 N.L.R.B. 1472 (1982) ................................................................... 37

*Mike-Sell's Potato Chip Co. v. Nat'l Labor Relations Bd.*,
    807 F.3d 318 (D.C. Cir. 2015) ............................................................ 47

*NLRB v. Cauthorne*,
    691 F.2d 1023 (D.C. Cir. 1982) .......................................................... 46

*NLRB v. McClatchy Newspapers, Inc.*,
    964 F.2d 1153 (D.C. Cir. 1992) ..................................................... 46, 47

*Phillips 66*,
    369 NLRB No. 13 (2020) .................................................................... 45

*Prentice-Hall, Inc.*,
    306 NLRB 31 (1992) ........................................................................... 45

*RBE Electronics*,
    320 NLRB 80 (1995) ........................................................................... 38

*Saint-Gobain Abrasives, Inc.*,
    343 NLRB 542 (2004) .................................................................... 39, 40

*Serramonte Oldsmobile v. NLRB*,
    86 F.3d 227 (1996) ......................................................................... 37, 41

*Standard Dry Wall Products*,
    91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951) ................... 33

*Stanford Hosp. & Clinics v. NLRB*,
    325 F.3d 334 (D.C. Cir. 2003) ...................................................... 36, 48

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) ....................................................................... 50, 52

*Taft Broadcasting Co.*,
 163 NLRB 475 (1967) .................................................................31, 43, 44, 45

*The Finley Hospital*,
 362 NLRB No. 102 (2015) ...........................................................................45

*Thrifty Payless, Inc*,
 371 NLRB 124 ...............................................................28, 30, 34, 50

*TruServ Corp. v. NLRB*,
 254 F.3d 1105 (D.C.Cir.2001) .............................................................33, 43, 42

*Universal Camera Corp. v. NLRB*,
 340 U.S. 474 (1951)........................................................................36

**Statutes**

29 U.S.C. §158(a)(5)................................................................................3, 4

29 U.S.C. § 158(d) (1988) .............................................................................47

29 U.S.C. § 160(e)-(f) ...................................................................................2

29 USC Sec. 186(c).........................................................................................7

National Labor Relations Act ..................................................................... 2

# GLOSSARY OF ABBRIEVIATIONS

Rite Aid refers to the Petitioner, "Thrifty Payless, Inc., d/b/a Rite Aid." Petitioner and Rite Aid are used interchangeably.

The "Act" refers to the National Labor Relations Act.

The "Board" refers to the National Labor Relations Board.

The "Fund" refers to the UFCW Northern California and Drug Employers Health and Welfare Trust Fund.

The "Union" refers to the United Food and Commercial Workers Local 8-Golden State.

"JA" refers to "Joint Deferred Appendix."

"PA" refers to "Petitioner's Supplemental Deferred Appendix."

"SA" refers to "Supplemental Joint Deferred Appendix."

## <u>JURISDICTION</u>

On August 11, 2022, the Board issued the final Decision and Order in this proceeding (371 NLRB No. 124) (the Board's "Decision").  On August 12, 2022, Rite Aid timely filed a Petition for Review of the Decision with this Court.

After the Board issues a decision and final order in a contested unfair labor practice case, any person aggrieved may petition for review of the final order, and the Board may seek enforcement of its order, in an appropriate United States Court of Appeals.  <u>See</u> 29 U.S.C. § 160(e)-(f).  Thus, Rite Aid has standing as the aggrieved party of the Board's Decision and this Court has jurisdiction over Rite Aid's Petition for Review and the Board's Petition for Enforcement of its order under Sections 10(e) and (f) of the National Labor Relations Act, (hereinafter, the "Act"), 29 U.S.C. § 160(e)-(f).

## **STATUTES, RULES, OR REGULATIONS**

UNFAIR LABOR PRACTICES

Sec. 8. [§ 158.] (a) [Unfair labor practices by employer] It shall be an unfair labor practice for an employer—

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [section 159(a) of this title].

29 U.S.C. §158(a)(5).

3

## STATEMENT OF ISSUES

1. Whether the Board erred by failing to find that Petitioner's decision to implement the movement of medical insurance coverage for 3,000 of its associates from a failing union sponsored fund to Rite Aid's own insurance plan was supported by economic exigency.

2. Whether the Board erred in finding that Rite Aid violated Section 8(a)(5) of the Act, 29 U.S.C. §158(a)(5), by declaring impasse and implementing its final proposal after bargaining with the Union for over eighteen months without material movement by the union on the dominant issue of bargaining (health insurance).

3. Whether the Board's ruling, adopting the findings and conclusions of the Administrative Law Judge ("ALJ") that there was no impasse in bargaining, irreparably conflicts with the undisputed facts in the record.

4. Whether the Board erred in ordering Rite Aid to pay contributions to a defunct union sponsored health insurance plan without a factual basis in the record and despite evidence that Rite Aid had supplied the same insurance coverage to its 3,000 employees with no additional cost to them.

4

## STATEMENT OF THE CASE

In deciding that Rite Aid violated Section 8(a)(5) of the Act by declaring impasse and implementing a change in health insurance from a near bankrupt health insurance plan (the multi-employer UFCW Northern California and Drug Employers Health and Welfare Trust Fund) to a well-funded Rite Aid sponsored plan, the Board ignored uncontradicted material evidence in the record about bargaining history and the fiscal status of the Plan; applied its own caselaw incorrectly, and fashioned a remedy without support in the record. The Board's errors are substantial, and warrant review and rejection by this Court.

## STATEMENT OF FACTS

On January 27, 2020, the United Food and Commercial Workers Local 8-Golden State (the "Union") filed an Unfair Labor Practice ("ULP") charge alleging that Rite Aid "failed and refused to bargain with [the Union] by unilaterally implementing its own proposal for wages and health insurance for its employees represented by [the Union] . . . despite not having reached impasse." (SA001). As a result, the Regional Director issued a Complaint and Notice of Hearing. (JA058-063). In preparation for the hearing before the Administrative Law Judge ("ALJ"), Rite Aid, the Union and the Board's General Counsel filed a "Joint Motion to Submit Partially Stipulated Record to the Administrative Law Judge" (hereinafter "Joint Motion"). The Joint Motion established:

> *[C]ertain facts and exhibits that the parties agree are true and should be included in the evidentiary record in this proceeding.*

(See JA084) (emphasis added).

Almost all the facts which are material to this case are undisputed or have been stipulated to by the parties. (See JA084). The remaining pertinent facts are taken directly from the December 9, 2021 ALJ decision and the August 11, 2022 Decision and Order of the National Labor Relations Board (the "Board").

The only disputed fact surrounds an oral exchange between Mr. Steven Stemerman ("Stemerman"), the Union's chief spokesperson, and Ms. Laura Pierson-Scheinberg ("Pierson-Scheinberg"), Petitioner's chief spokesperson, during the December 5, 2019 bargaining session; which was the last bargaining meeting before implementation of Rite Aid's final proposals at impasse.

ALJ Dickie Montemayor issued a decision on December 9, 2021. (JA001-019). The parties subsequently filed exceptions and cross-exceptions with the NLRB. On August 11, 2022, the Board issued the final Decision and Order in this proceeding (371 NLRB No. 124). (JA042-054). On August 12, 2022, Rite Aid timely filed a Petition for Review of the Board's Decision with this Court.

This case involves a single issue impasse over Rite Aid's continued participation as the only employer in the multi-employer UFCW Northern California and Drug Employers Health and Welfare Trust Fund (the "Fund"). (JA594-95).

### A.    History of the Fund and the Collective Bargaining Agreement

Rite Aid is engaged in the business of operating retail drug stores and pharmacies in Northern California. (<u>See</u> JA045). For over 30 years, Rite Aid has had a collective bargaining relationship with the Union, and there have been a series of collective bargaining agreements setting out the terms and conditions of employees in the large 3,000 associate bargaining unit covering various stores in Northern California. (<u>See</u> *id.*; <u>see also</u> JA541). Since 1987, Rite Aid has made contributions to the Fund to provide health, welfare, dental and sick leave benefits to its associates. (JA090-092; JA093-095; JA441). The Fund was originally a *multi-employer* Taft Hartley Fund. <u>See</u> 29 USC Sec. 186(c). (JA442, 540-41).

By 2018, Rite Aid was the sole employer contributing to the Fund. (JA096-102; JA541). Relevant here, and pursuant its collective bargaining agreements with the Union[1], Rite Aid made 100% of its required monthly contributions to the Fund. (JA090-092; JA093-095; JA540-44). The rate or amount of the contributions were the subject of collective bargaining negotiations between Rite Aid and the Union, and at all times the Fund accepted the rates and contribution amounts negotiated by

---

[1] There were two CBAs between the Petitioner and the Union that were effective from July 14, 2013 – July 13, 2019. (JA090-092; JA093-095). Both CBAs had identical "Schedule A Group Insurance – Health and Welfare, Dental and Sick Leave" provisions. (JA090-092; JA093-095). One CBA was designated for "Clerks" and the other CBA was designated for "Pharmacists." (JA090-092; JA093-095).

Rite Aid and the Union.  (JA090-092; JA093-095; JA441).  This is not a case where Rite Aid failed to fulfill its contribution obligations at any time.  (<u>See generally</u> JA441, 543-44).  The last CBA prior to the implementation, which is at issue here, ended on July 13, 2019.  (JA090-092; JA093-095).  From the CBA's termination date until implementation, Rite Aid continued to contribute to the Fund at agreed upon rates and amounts.  (JA463, 558-69; JA096-102; JA133; JA343-44).

### B.    Segal Consulting's 2018 Report Showed the Fund Was Rapidly Deteriorating and its Reserves Were Depleting.

Despite Rite Aid's continued full payment of contributions, the Fund became fiscally unstable starting in early 2018.  (<u>See</u> JA096-102).  On February 27, 2018, the Fund's independent actuarial consultant, Segal Consulting ("Segal"), provided a report to the Fund's Trustees explaining the Fund's rapid deterioration.  (JA096).  The report attributed the Fund's dire financial situation to "increased claims experience coupled with reduced hours."[2]  (JA096; JA472).  Segal reported to the Trustees that over an eighteen-month period, "the Fund experienced a loss of over $6.4 million," and ended the 2017 plan year with around $4.4 million (2.2 months) in reserves to pay claims.  (JA096).  Segal emphasized, and the Union and Rite Aid

---

[2] Here, "increased claims experience" means a higher volume of claims submitted and more expensive claims.  (JA096).  The CBA requires that contributions are based on hours worked by the associates in the bargaining unit.  (JA090; JA093).  When a Rite Aid store reduces hours of associates due to lack of business at that store, there is a resulting reduction in contribution amounts.  (JA096).

were aware, that *2.2 months of reserves were insufficient* to support continued guaranteed payment of benefits.    (JA096-097; JA472-73).    This undisputed conclusion of insufficiency is critical evidence ignored by the ALJ and subsequently by the Board.  See *infra*  Section D.  A negative balance meant that the Fund had no money to pay healthcare claims of the 3,000 Rite Aid associates and their covered family members.  (JA628 – Liang).

Segal also informed the Trustees that the Fund's reserves would stay depleted *without extensive changes* to plan benefits and contribution rates and suggested various options to improve the financial condition of the Fund.  (JA096-097).  At that time, Rite Aid was paying approximately $20 million per year in employer contributions.  (JA098).

The warning from Segal prompted the Union to demand that Rite Aid meet in April 2018 to discuss the situation and negotiate provisions to remedy it.  (JA472, 539).  This meeting started the bargaining which ended in impasse almost two years later.  See *infra* Section C.

### C.    The Parties had Ten Bargaining Sessions over Twenty Months-All Focused on the Fund.

During the bargaining sessions each Party had external counsel as its chief spokesperson (Union-Stemerman and Rite Aid- Pierson-Scheinberg).  (JA488, JA538, JA542, SA007 –Vogt).  The bargaining here is replete with evidence that the Union: (a) refused to consider or make meaning proposals to address the Fund's

continued viability; (b) engaged in dilatory actions designed to force Rite Aid to deal with a continuously dwindling Fund reserve, and (c) threatened and engaged in economic action at the mere proposal by Rite Aid to cover its associates' health and related benefits under a company sponsored plan.  <u>See</u> discussion *infra* Sections I, II.  These actions are undisputed in the record, and all of them are the factual predicate for impasse and the movement of insurance benefits because of exigency. *Id.*

### 1.    May 2018 - First Bargaining Session Two Months After Segal Report.

The Union did not contact Rite Aid until two months after Segal issued its February report.  (<u>See</u> JA103-104).  Reacting to the dire financial status of the fund and the Union's May 1, 2018 demand to meet, Rite Aid offered to meet on May 7 as a possible bargaining date. (<u>See</u> *id.*).  The Union, however, was not available until May 21 or May 22, 2018.  (*Id.*).

During the first meeting on May 22, 2018, Pierson-Scheinberg identified Rite Aid's two primary goals for any agreement on Rite Aid's Fund contributions as:

(1) Ensuring any agreement on the Fund's healthcare insurance ensure the long-term viability of the Fund. (JA542).

(2)    Requiring cost neutrality in any agreement because of Rite Aid's increased costs and need to make pay increases in Northern California.  (*Id.*).  "Cost neutrality" meant that any increase in Rite Aid's costs in the Collective Bargaining

10

Agreement were for increases in pay rates; and no increases in costs for medical insurance. (See JA542).

Pierson-Scheinberg also informed the Union that she had a written proposal to move Rite Aid associates to a Rite Aid-sponsored healthcare plan. (JA551). The import of this proposal is that Rite Aid identified at the earliest time in bargaining that movement of the insurance coverage to a Rite Aid sponsored plan was a way to avoid the imminent failure of the Fund. (See *id.*). Stemerman's response set the table for the Union's intransigence throughout bargaining. (See JA552). He stated that the Union would view such a proposal as a declaration of war. (*Id.*). During the Hearing, Union representative Heise admitted that the Union's opposition to a Rite Aid sponsored healthcare plan has been "steadfast" for fifteen years, and the Union had never agreed to previous proposals from Rite Aid to move associates into such a plan. (JA466). Based on the Union's threats, Rite Aid withheld the proposal to give the Union a chance to make a proposal that would keep the Fund in place, rather than invoking hostility between the parties. (JA551-52; JA213-15, 234, 239; JA262-64).

Despite its knowledge of the Fund's fiscal status and Segal's warning, the Union did not make any proposal as to the Fund at the May 22, 2018 meeting or in days following that meeting. (JA544). On May 30, 2018, Pierson-Scheinberg wrote to Stemerman asking to resume bargaining as soon as possible due to "the urgency

11

and potentially dire consequences of inaction" and "[t]o ensure that Rite Aid associates do not lose access to health insurance." (JA103-04). Pierson-Scheinberg expressed concerns with the status of negotiations and stated:

> *When the Parties finally met on May 22, Rite Aid anticipated seeing a comprehensive proposal; however, the Union only proposed that Rite Aid increase it contributions by $0.18/hour.  I noted that, according to the Fund's actuarial report, this would not solve the Fund's long-term financial situation.*[3]  The Union stated that it was not ready to make a proposal beyond the $0.18.  Instead, the Union indicated it would send the Union a proposal at a later date.

(JA103-04) (emphasis added).  Given the knowledge it had about the Fund's status, this proposal was nothing more than a delaying tactic.

The Union's actions provide the proof of its intent to delay because Rite Aid never received a response. (JA545).  Despite its knowledge of the Fund's continuing decline, the Union did not reach out to Rite Aid until three months later.  (JA545).

### 2.  September 20, 2018 – No Proposal and Union Representatives opt to Golf Instead of Attending Bargaining Session.

The Parties next met in September 2018.  Even though the Parties had previously agreed to meet that day, most of the Union's bargaining team *attended a charity golf tournament instead*.  (JA546; JA199).  Stemerman, the sole representative present for the Union, stated that the Union's cupboard was empty

---

[3] Pierson-Scheinberg's position was later corroborated as accurate by the Fund's continued losses even after Rite Aid increased its contribution by $1.95. (JA434-438, Section 6A).

12

and did not present any proposal. (JA546; JA199). The Fund's status continued to decline. (JA546).

### 3. October 4, 2018 – Union's First Formal Proposal with Exorbitant Costs to Rite Aid.

At this meeting, the Union demanded that Rite Aid increase its hourly contributions 18 cents retroactive to July 1, 2017 and another 18 cents retroactive to July 1, 2018. (JA105-108). The proposal further demanded Rite Aid to increase its contributions under one of the following options:

> July 2019 hours: $1.07 increase to Platinum rate (currently $4.93) & Gold rate (currently $3.70), to bring Platinum to $6.00 and Gold to $4.77; OR

> $0.63 increase to Platinum and Gold Rates in July 2019 and an additional $0.63 increase to Platinum and Gold rates in July 2020; OR

> $0.58 increase to Platinum and Gold Rates in January 2019 and an additional $0.58 increase to Platinum and Gold Rates in January 2020.

(JA106). The Union's Proposal also included an increase to Rite Aid's pension contributions, as well as ratification bonuses and wage increases. (JA107-08).

The proposal was not cost neutral as to the Fund. (JA547). Throughout Bargaining, Rite Aid informed the Union that its stores in the Northern California were losing money— decreased customer counts, sales, and EBITDA (JA119) — and Rite Aid needed to direct whatever additional money it could provide to wage increases for associates, given the high cost of living in the region and the fact that

13

their wages set by bargaining in the expiring CBA had fallen behind market. (JA547).

### 4.    November 5, 2018 – Union's Refusal to Submit a Cost Neutral Proposal.

The Parties reconvened on November 5, 2018. (JA088, ¶ 3). Rite Aid rejected the Union's October 2018 proposal because it was "a Band-Aid approach" that would increase Rite Aid's costs substantially while failing to address the looming risk of 3,000 Rite Aid associates losing their healthcare. (JA549-552). The Union responded that it was time for Rite Aid to "pay up" and "do their share." (JA550; JA206). The Union refused to address how its proposal would address the Fund's long-term viability. (JA551).

### 5.    June 25, 2019 – After Five Months of Delay the Union Submitted Yet Another Proposal with Exorbitant Costs to Rite Aid.

Although, the Fund's fiscal status was continuing to decline, Rite Aid did not hear from the Union *again for five months*. (JA554). The parties scheduled a bargaining session for June 25, 2019. (JA088, ¶ 3).

Stemerman began the session by stating that there was a "very serious problem" with the Fund and that "virtually any day our fund can go under water" because it was down to "a few weeks' reserves" and a couple large claims "will sink us." (JA213; JA262). Stemermen stated "*we have no intention of negotiating out of that fund*." (JA213; JA262) (emphasis added). This is yet another absolute position

14

on the only significant subject of bargaining. (See *id.*). The Union, also threatened to take economic action against Rite Aid if it did not agree to the Union's proposals. (JA213-14; JA262-63; JA556).

Once the Segal representative, Sweeney, arrived at the meeting, the Union presented an updated Memorandum of Agreement for a successor contract. (JA111-12). In this document, the Union proposed increasing Rite Aid's hourly contribution rate by *$1.95*, with the same cost shifting to associates that it proposed over eight months prior in October 2018.[4] (JA111-12). This was a demand for even *larger contribution increases* that was not cost-neutral. (Compare JA111-12 with JA105-108). The proposal also contained the same wage increases and ratification bonus it proposed in fall 2018. (JA11-12).

Rite Aid responded that the proposal was exorbitantly expensive and rejected it. (JA557; JA214-15; JA262-63). Pierson-Scheinberg asked the Union whether the Union had alternative proposals. (JA215; JA262-63; JA345-351). The Union had no alternative proposals to submit. (JA217). Pierson-Scheinberg stated that she had authority to propose Rite Aid sponsored healthcare but *was holding off because the Union had threatened economic action against Rite Aid.* (JA557; JA213-14; JA262-63; JA388-401) (emphasis added). Hoping to facilitate more dialogue through

---

[4] In the 2018 Proposal, the Union demanded increased costs for Rite Aid associates, in the form of benefit modifications that would not be effective until January 1, 2019. (JA105-108).

successful negotiations on minor issues, Rite Aid made some non-economic proposals at this meeting. (JA113-15). The Union had no interest in these proposals, and the session ultimately concluded. (JA558). [5]

### 6. Extension Agreement Resulting in Substantial Additional Cost to Rite Aid.

With the CBAs set to expire on July 13, 2019, the Union proposed an extension under which Rite Aid would pay the increased hourly contribution rate that the Union included in its June 25 proposal-$1.95 cents per hour to a total of $5.72 per hour worked. (JA558 - Pierson-Scheinberg). Rite Aid agreed to the extension, despite the substantial additional cost, as a good-faith effort to continue health insurance coverage through the Fund on a short term basis while the parties continued bargaining discussions. (JA558-59 - Pierson-Scheinberg). The Parties agreed to extend the CBA through August 31, 2019 while Rite Aid waited for the Union to make a meaningful proposal addressing the Fund's long term viability which also met the Company's cost neutral parameters. (JA116; JA558).

### 7. August 12, 2019: Union Rejected all of Rite Aid's Proposed Alternatives Based on Segal's Report.

The Parties had their fifth bargaining session on August 12, 2019 attended by Segal. (JA560). Rite Aid passed a chart of potential cost savings for healthcare that

---

[5] There was never discussion of proposals afterwards. (JA558). Rite Aid ultimately withdrew these proposals because of the Union's refusal to engage in discussions. (JA134-35).

it based, in large part, on recommendations from the Segal report. (JA117; JA561). Although the Union explained that it might be willing to do a variation of auto-enrollment (JA224-27), it otherwise rejected all of Rite Aid's proposed alternatives and plan design modifications, even though these options were suggested directly *by the experts*- Segal. (JA562; JA231; JA274). *The Union did not make any counter proposal*. (JA562).

### 8. August 16, 2019 – No Progress.

Rite Aid began by explaining based on customer counts, sales, and EBITDA in Northern California, over half the stores were down in revenue from the prior year and that Rite Aid was seeing indicators of layoffs and store closures. (JA234-41; JA281). Pierson-Scheinberg stated that increase in healthcare contributions in the Union's demand in each year of the agreement would push the region "off a cliff." (JA239; JA285; JA566). Meaning that store closures and layoffs would have to happen in Northern California. (See *id.*). Pierson-Scheinberg stated, "I beg of you to see if you have any answers" because otherwise, the Fund would dissolve and more than 3,000 employees would be left without coverage. (JA239). The Union refused to engage in discussions and did not present any alternative healthcare proposals. (JA567).

Soon thereafter the Parties executed a second extension agreement that extended the CBAs through September 30, 2019. (JA133). Rite Aid continued to

17

pay the Union's requested increased contribution rate of $5.72, a $1.95 increase from the Parties' expired CBAs, to give the Parties time to bargain over the Fund. (JA133).

> ### 9. September 11, 2019 – Union Submitted a Proposal after Two Hours which demanded additional Increases from those in Prior Proposals.

On September 11, 2019, despite Rite Aid's requests, the Union failed to provide any proposals on healthcare insurance at the beginning of the session. (JA088, ¶ 3). Two hours into the session, the Union proposed a one-year extension with an increased Fund contribution rate of $5.72 (a $1.95 increase), an 11.5 cent increase to pension rates, and a signing bonus, but with no associate wage increases. (JA243). The $1.95 increase *is the exact same as requested in the Union's June 2018 Proposal* which suggested increasing Rite Aid's hourly contribution rate by *$1.95*, with the same cost shifting to associates that it proposed over eight (8) months prior in October 2018. (JA111-12) (emphasis added).

The proposal was obviously not cost neutral, which Rite Aid consistently required for any proposal regarding the Fund since May 22, 2018, more than a year prior. (JA542 - Pierson-Scheinberg). The Union's demand would have resulted in a totally unreasonable *52%*[6] increase in Rite Aid's Fund contributions alone and

---

[6] Rite Aid's blended hourly contribution rate was $3.77 (JA090-092; JA093-095; JA443), and a $1.95 increase to that is 51.72% increase.

18

leave no additional money for wage increases.

*This proposal failed to properly address viability of the Fund because the Fund continued to deplete despite Rite Aid paying the $1.95 increase to its hourly contribution rate over a period of three (3) months.*[7]  (J436 2, Section 6A).  This is another important fact ignored by the ALJ and the Board.

At this point, it was obvious that the Union would not be making any proposal that would ensure long term viability of the Fund while being cost neutral so that Rite Aid could devote its additional spending to wage increases.   Rite Aid formally proposed moving associates to a Rite Aid-sponsored healthcare plan.  (JA134-35).  Rite Aid's proposal provided the same benefits as the Fund's Gold Plan and the associates would not experience any disruption in healthcare.  (JA134-35; JA569).  Rite Aid stated that its proposal would maintain employee benefits similarly to the Fund and it would completely eliminate the growing risk of the Fund's viability.  (JA244; JA292).   Before Pierson-Scheinberg had the chance to pass the actual proposal document, the Union rejected it, and proclaimed it was a "non-starter."  (JA243; JA291).

Thereafter the Union carried out its previous threats to engage in war. (JA495, 574; SA004; JA357-387).   It began picketing Rite Aid stores; urging customers to

---

[7] Despite three (3) months of increased contributions in August, September, and October 2019 under the Extension Agreements the Fund continued to collapse. (*Id.*; JA116; JA133) (JA430-33, Section 5A).

boycott Rite Aid and handing out coupons to Rite Aid customers requesting them to transfer their prescriptions to Safeway. (*Id.*). There was no evidence in the record that the Union stopped picketing or boycotting throughout the remaining bargaining sessions. (See generally JA498-99).

> **10.    September 26, 2019 - No Movement from the Union and the Extension Agreement for Increased Contributions Expires with no meaningful improvement in the Fiscal Status of the Fund.**

On September 26, 2019, Stemerman again requested a one-year extension. (JA343-44). After all of the bargaining sessions with little to no compromise, Rite Aid believed that the Union was stalling[8] and deliberately placing 3,000 associates at risk for losing healthcare coverage. (JA568). See *infra* Section I.b. Pierson-Scheinberg rejected the Union's proposal "due to the draconian cost[s]" and to prevent further delay as the Fund continued to deplete. (JA342-44). Rite Aid also requested additional dates for bargaining. (JA342-44). The extension agreement expired at the end of September. (JA133).

---

[8] Rite Aid reached this conclusion based on the prior bargaining sessions and communications. For example, it took more than three weeks to schedule the first bargaining session after Rite Aid ensured its availability. (JA103-104). Following that meeting Rite Aid did not hear from the Union for three months. When the parties were finally able to meet in September 2018, most of the Union's bargaining team attended a golf tournament instead. (JA546; JA199). For many of the following bargaining sessions, the Union did not have a proposal to present.

**11.    October 25, 2019 – The Union continued to refuse to discuss movement to a Rite Aid Plan and Threaten Further Financial Harm Against Rite Aid.**

In late October 2019, the Union's representatives began the session with hostility.  (JA088, ¶ 3; JA253-54; JA299; JA38-390; JA571-72).    The Union threatened further escalation of economic action and stated that the Union's current actions were not yet a "declaration of war," but the acts were only "a shot across the bow." (JA253-54; JA300).  Pierson-Scheinberg explained that the Union's actions were pushing the accelerator on store closures in the region.  (JA253-54; JA300; JA572-73).   In response, the Union proclaimed "absolutely, we are doing that." (JA253-54; JA300; JA572-73).

Following that exchange, the Union made an ultimatum that it would withdraw all prior proposals about healthcare plan modifications if Rite Aid did not agree to either the Union's proposal or an extension by the end of the day.  (JA 573; JA253-54; JA299; JA38-390).  This was an obvious message that the Union was locked into a failing fund. Rite Aid did not agree to that ultimatum and Pierson-Scheinberg "left this meeting feeling like this is over. We're at impasse."  (JA573).

**12.    October 28, 2019 – Union Refused to Consider Rite Aid's Proposal.**

Three days after the October bargaining session, Rite Aid emailed its proposal to move the insurance coverage from the Fund to a Rite Aid sponsored plan. (JA136).  In the email, Rite Aid further stated that despite eight (8) meetings over

21

eighteen (18) months, the Union's "proposal has not substantially changed during that time, despite our efforts to find alternatives" and that the Union left Rite Aid "with no choice, particularly now that you've said you're withdrawing your offer." (JA136). In its economic package proposal, Rite Aid added wage increases to its healthcare proposal which *matched those in the Union's previous proposals*. (JA147-150; JA575). In other words, the *only* issue was health insurance. Rite Aid conveyed that the proposal depended on acceptance of Rite Aid sponsored healthcare insurance. (JA136).

Stemerman responded the next day, stating "[a]s to your proposal to switch to the company health plan, you are well aware that UFCW 8 has rejected that proposal" and that "the International has made it clear to Locals 5 & 8, it would not permit either local to negotiate out of the Taft Hartley plan into the Rite Aid company plan." (JA137-38).

### 13. November 19, 2019 – Union Arrived at Session with No Proposal.

The Parties met on November 19, 2019. (JA088, ¶ 3). By this meeting, it had been over two months since Rite Aid proposed moving health insurance to its sponsored plan. A proposal which the Union rejected *outright, with no response, counterproposal, or questions presented by the Union.* (JA137-38). Stemerman began the meeting by explaining the Union was working on a comprehensive proposal, and that they could "*maybe*" make a proposal at the Parties' next meeting.

22

(JA256; JA303). At this time, the Parties had not scheduled a follow-up meeting. (JA256; JA303). The Union's vague reference to "maybe" present a comprehensive proposal at an unidentified future meeting was a stall tactic, allowing the Fund to become more precarious and placing over 3,000 employees' health insurance at risk unless Rite Aid conceded.

As a result, Pierson-Scheinberg declared that the Parties were at impasse; Stemerman disagreed. (JA509, JA256; JA303). Pierson-Scheinberg explained that the Parties had met nine times and the Union failed to provide a proposal addressing the viability of the healthcare insurance even though the Fund was down to only a few weeks of reserves. (JA578; JA256; JA303). The Union responded by threatening to conduct a strike would be "a lot worse" than the cost of the Union's proposal. (JA256; JA304).

Pierson-Scheinberg explained that Rite Aid would continue negotiations if Union could provide a proposal "that is *significantly different*" from prior proposals. (JA256-60; JA304) (emphasis added). The Union caucused and returned with no proposal. (JA256-60; JA305; JA467, 510). After the Parties scheduled the next meeting, Stemerman said the Union would "come back with the best we can do." (JA259; JA305).

**14.    December 5, 2019 - The Parties Were at Impasse and the Fund was on the Brink of Bankruptcy.**

By the December 5 session, Rite Aid's healthcare proposal had been on the table for nearly three months after more than a year of negotiations. However, the Union did not ask any questions or make any requests for information on the proposal until after Rite Aid said the Parties were at impasse on November 19 and only shortly before the December 5, 2019 bargaining session.  (JA182-86).  Going into the December 5, 2019 session, Rite Aid still believed that the Parties were at impasse.  (JA 473, 523).

Incredibly, the Union arrived at the meeting without a proposal.[9]  Eventually, the Union orally presented a proposal several hours into the bargaining session- yet another indication that the Union was stalling.  (JA580 - Pierson-Scheinberg; JA467 - Heise; JA511- Stemerman; JA309).  Although unorthodox, Rite Aid offered to reduce the Union's proposal to writing because Pierson-Scheinberg believed that the parties were at impasse, and she wanted to record that the Union's proposal was inadequate and very similar to a proposal that Rite Aid had rejected months earlier. (JA580 - Pierson-Scheinberg).

The Union's proposal included two specific proposed cost saving features for the Fund: no auto-enrollment for new hires (after ratification) and bifurcation of

---

[9] Union's failure to arrive with a proposal further delayed the Parties' negotiations.

24

coverage into a Healthcare Partnership tier and a Personal Directions tier (which would not be effective for over a year, on January 1, 2021). The proposal also called for substantial increases of Rite Aid's hourly Fund contributions, from $3.77 per hour to $5.02 per hour ($1.25) on November 1, 2019, with additional $0.25 yearly increases for the two years after ($1.75 and $2.00). (JA151-54). The proposal did not substantively address the long-term viability of the Fund. (JA318-19; SA024 - Liang; see also J436, Section 6A (Fund continued to fail even after three months of Rite Aid paying increased hourly contribution of $5.72 – *70 cents more hour than the Union's proposed increase*)). When Pierson-Scheinberg asked the Union to explain how the proposal would build up reserves and remain viable long-term, *Stemerman responded "we've given up on that."* (JA319; JA526 - Stemerman).

### 15. Union Made Additional Threats of Economic Harm to Rite Aid at the Conclusion of December 5, 2019 Bargaining Session.

At or around 6 p.m., Pierson-Scheinberg had to leave the bargaining session, so Rite Aid's bargaining team walked to the Union's caucus room to determine their status. (JA582 - Pierson-Scheinberg; JA641-42 - Lavaroni). Stemerman said that the Union was still reviewing Rite Aid's draft of the Union's proposal and would send back any changes. (JA642 - Lavaroni). All witnesses agree that Pierson-Scheinberg said that once Rite Aid received it, she would address it with her client.

(JA470 - Heise; JA513 - Stemerman; JA535 - Vogt; JA582 - Pierson-Scheinberg; JA644 - Lavaroni).

As the discussions became more than just a comment about reviewing the written document for accuracy, Lavaroni began taking notes. (JA642-644 - Lavaroni). Thereafter, in response to Pierson-Scheinberg's statement that she would address the proposal with Rite Aid, Stemerman stated that the Union's proposal was take it or leave it, all or nothing, and if Rite Aid did not accept the proposal, the Union would take further economic action against the Company. (JA 323; JA 582 - Pierson-Scheinberg; JA643 - Lavaroni). Stemerman refused to put those threats in writing. (JA583 - Pierson-Scheinberg; JA643 - Lavaroni; JA 323).

### 16.    Unmistakable Declaration of Impasse and Implementation to Prevent Associates from Losing Healthcare.

From May 2018 to November 2019, right before the December negotiations the Fund's reserves dwindled from $3.2 million to $1.2 million, *the latter amount of reserves only covering 0.7 months*. (<u>Compare</u> J404-08 and JA434-38). The Union's new proposal was substantially similar to the proposal made on October 4, 2018, which Rite Aid rejected. (JA583 - Pierson-Scheinberg). For example, the Union's December 5, 2019 proposal included a $1.25 increase to the blended rate, effective November 1, 2019. (JA151-54). In its October 2018 proposal, the Union demanded Rite Aid to increase its contributions by almost the identical amount: 36 cents of retroactive increases, and several options for increases in later years, including a

one-time increase of $1.07 in July 2019 to bring the total to $1.43. (JA105-08). Heise admitted that the increases the Union proposed in October 2018 were only slightly more than the $1.25 increase that the Union proposed in December 2019. (JA486 - Heise). During the December 5 bargaining session, the Union stated this proposal was *the "best that we can do."* (JA605 - Pierson-Scheinberg).

Rite Aid reviewed the offer and rejected it. (JA585 - Pierson-Scheinberg). On December 20, 2019, Rite Aid informed the Union by letter that the Parties were at impasse and that it planned to implement its final offer on January 1, 2020. (JA160-66). Rite Aid also pointed out that "[t]he Union continues to refuse to consider or discuss in good faith any alternatives to the continuation to the Fund" even though the Fund was almost depleted. (*Id.*).

Following the impasse declaration, the Parties corresponded about the declaration (*Id.*), but the Union made no further requests to meet, proposals or attempts to break the impasse. (JA586 - Pierson-Scheinberg). Rite Aid implemented its offer on January 1, 2020. (JA471 - Heise).

**D.    The Board's Decision and Adoption of the ALJ's Determinations.**

The Board's key rulings, which are at issue, are as follows:

**1.  Without comment or alteration, the Board adopted the decision and reasoning of the ALJ in analyzing whether there was an economic exigency at that time of Rite Aid's implementation of the change in health insurance**

27

**without comment or statement.** *See Thrifty Payless, Inc. d/b/a Rite Aid*, 371

NLRB No. 124 at 1. (JA042) The ALJ concluded that there was no exigency. The

ALJ explained:

> Respondent waited until late October to present its first proposal and
> didn't provide cost information until December 2, 2019. It cannot be
> said that this delay and the limitations it placed upon the Union in not
> only crafting a proposal but doing so within the framework of the
> existing plan was not "reasonably foreseeable" or "beyond the control
> of the employer."

(JA015). This determination was not based on the facts in the record. (See JA551,

557 - Pierson-Scheinberg; see also JA213-14; JA262-63; JA396-97). At that very

first bargaining session in May 2018, Pierson-Scheinberg informed the Union that

she had a written proposal to move Union members to a Rite Aid-sponsored

healthcare plan. (*Id.*). Again, in June 2019, Pierson-Scheinberg informed the Union

that she had authority to propose Rite Aid sponsored health care but the Union

vehemently refused to engage in any discussions regarding the proposal. (*Id.*).

Pierson-Scheinberg ultimately held off on submitting a written proposal because the

Union had threatened economic action against Rite Aid. (*Id.*) Therefore, substantial

evidence does not support the ALJ's reasoning. See *supra*.

In addition, the ALJ concluded that the fact that the Fund was able to function

for 35 years with employer contributions set by bargaining vitiated any exigency:

> Health plans by their very nature are full of uncertainty. It is impossible
> to predict what claims might come in and how that would impact the
> reserves. Such projections are best left to the benefits experts.

28

(JA015).  There is no evidence in the record to support this ipse dixit conclusion that history alone would cause the Fund to survive. (See *id.*; JA434-38).  This erroneous conclusion highlights the rest of the ALJs mistakes in judgment.  This fund was failing according to the experts- Segal- because of recent very substantially increasing health care costs and less hours worked due to Rite Aid's market conditions.  (See generally JA096-102).  Since this conclusion is a lynchpin of the ALJ's reasoning, the rejection of Rite Aid's defense of economic exigency must not stand.

Finally, the ALJ ruled that Rite Aid simply implemented the change in bad faith and "did not wish to wait for further bargaining toward agreement or impasse." (JA016).  This contention is also unsupported by substantial evidence record.  (See JA103-04; JA116; JA133; JA546, 558 - Pierson-Scheinberg; JA199). Throughout bargaining Rite Aid made affirmative good-faith efforts to continue bargaining despite the Union's efforts to delay negotiations.  (*Id.*).  It was not until the Fund was days away from collapse and the Union *admitted they would not present a proposal addressing the long term viability of the Fund,* that Rite Aid declared impasse and unilaterally implemented its proposal. (JA605 - Pierson-Scheinberg; JA319; JA526 - Stemerman; JA434-38;  JA160-66).  Each of these rulings and the reasons for them are not supported by the record. See *supra.*

29

**2. On the question of whether impasse existed supporting Rite Aid's implementation of its proposal, the Board also adopted the ALJ's findings of fact and conclusions of law.** However, Member Kaplan stated that he was relying on

> [t]he judge's finding that prior to declaring impasse, the Respondent failed to articulate adequately its goal either to replace the Union's Northern California and Drug Employers Health and Welfare Fund (the fund) with and employer sponsored plan or establish a six-month reserve for the Union's fund.

*Thrifty Payless, Inc. d/b/a Rite Aid*, 371 NLRB No. 124 at 1 fn.2.   (JA042)

Additionally, Member Kaplan relied on

> the judge's finding that the Union's December 5, 2019 counterproposal demonstrated significant movement toward the Respondent's articulated bargaining positions and that the counterproposal warranted a more thorough review and response from the Respondent before it declared impasse.

*Id.*

Contrary to this finding, there is undisputed evidence that Rite Aid articulated its goals as early as the first meeting between the parties in May 2018, more than a year and a half prior to impasse. (JA542 - Pierson-Scheinberg).   Rite Aid's two primary goals which remained throughout negotiations were: (1) to ensure the long-term viability of the Fund and (2) to require cost neutrality in any agreement because of Rite Aid's increased costs and need to make pay increases in Northern California. (*Id.*).  The evidence in the record is that the Union's December 5 proposal was very similar to its previous proposals already rejected by Rite Aid- it only increased Rite

30

Aid's contribution costs with no assurance of sustainability and left no money for raises. See discussion *infra* at Section II.

The ALJ's analysis of and conclusions on the *Taft Broadcasting Co.*, 163 NLRB 475, 478 (1967) factors were as follows:

a.  The bargaining history between the Parties would as a matter of "ordinary prudence" dictate giving the parties a fuller opportunity to effect an agreement than occurred here.  (JA012).

- Pierson-Scheinberg had informally raised the possibility of Rite Aid sponsored healthcare as early as 2018, then formally proposed it at the September 11, 2019, bargaining session. (See JA551; JA557; JA569, SA014 – Pierson-Scheinberg). In that entire year, the Union did not make one request for information on the Rite Aid sponsored health plan. (*Id.*).  Therefore, the union had a full opportunity to investigate and negotiate the agreement prior to impasse.  (See *id.*)

b.  The limited duration of negotiations supports the conclusion that no impasse existed, and specifically:

Forty-four minutes is a woefully inadequate amount of time and or opportunity to discuss the essential details of the plan without having the benefit of the experts of both sides confer regarding the effects of the proposed concession . . . This factor standing alone is sufficient to support a finding that the parties were not at impasse.

(JA012).

31

- Negotiations were not limited and do not support a finding that no impasse existed. See *supra*. The Parties met for ten bargaining sessions over eighteen months and the Union had numerous opportunities to present proposals and to participate in meaningful bargaining negotiations prior to impasse. *Id.*

c.  Rite Aid engaged in bad faith bargaining by asserting that it did not care whose name was on the health care plan if the plan met the benchmarks, and he concluded that the Union's December 5 proposal was arguably within Rite Aid's benchmarks. (JA013).

- This is an incorrect statement of the facts. (Compare with JA 542 – Pierson-Scheinberg). The record reflects that Rite Aid's proposal did not meet either benchmark established by Rite Aid which were (1) cost-neutrality and (2) long term viability of the fund. (*Id.*)

d.  The Union's December 5, 2019 proposal demonstrated continued willingness to compromise. (JA014).

- This is an inaccurate determination because the record reflects the proposal did not address the long term viability of the fund. (Compare JA319; JA 526 - Stemerman with JA 542 - Pierson-Scheinberg). Miniscule movements do not vitiate impasse.

32

e. Rite Aid could not premise an argument that impasse existed on its own unwillingness to compromise. (JA014).

- Rite Aid does not have a legal duty to alter its position on particular issues essential to an agreement. <u>See</u> *infra; see also TruServ Corp. v. NLRB,* 254 F.3d 1105 (D.C.Cir.2001); *Laurel Bay Health & Rehabilitation Center v. NLRB,* 666 F.3d 1365 (D.C.Cir.2012).

f. Finally, the ALJ concluded that "the Union's concessions constituted significant progress towards the goal desired by Respondent and invited further review and discussion of such from Respondent and its experts." (JA015).

- This conclusion was incorrect because the Union admitted the proposal and any future proposals would not be addressing the long term viability of the Fund which was one of the two goals of the bargaining sessions set out in May 2018. (<u>See</u> JA319; JA 526 - Stemerman <u>with</u> JA 542 – Pierson-Scheinberg).

**3. The ALJ discredited the testimony of Pierson-Scheinberg as to the exchange that occurred at the end of the December 5, 2019 meeting (relying on *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951).** (JAO11 at fn.3).

33

- In doing so, the ALJ ignored testimony of Lavaroni and his own crediting of Pierson-Scheinberg's testimony on virtually every other point. See generally *id.*

**4. The Board concluded that Rite Aid did not except to the ALJ's remedy of an affirmative bargaining order**. *Thrifty Payless, Inc. d/b/a Rite Aid*, 371 NLRB No. 124 at 1 fn. 3. (JA042)

- That is not correct. *See* Respondent's Exceptions to the Administrative Law Judge's Decisions ¶ 49 (Jan. 20, 2022) (stating "Respondent generally excepts to the Remedy.").

Nonetheless, the Board revised other portions of the Remedy, *Thrifty Payless, Inc. d/b/a Rite Aid*, 371 NLRB No. 124 at 1 fn. 3, and it therefore place the entire Remedy at issue in this appeal. It amended the judge's remedy to require that the Respondent rescind the changes only upon request by the Union. *Id.* The Board also stated, "Respondent shall, on request by the Union, restore the status quo ante consistent with the terms of the parties' collective-bargaining agreements, the most recent of which were effective from July 14, 2013, to July 13, 2019." *Id.*

The Board further amended "the judge's remedy to require that the Respondent make all delinquent contributions to the fund, including any additional amounts due to the fund on behalf of unit employees[.]" *Id.*

The correct ruling would have been to follow Member Wilcox who disagreed and explained he "would leave [the remedy] to the compliance stage of this proceeding[.]" *Id.* Member Wilcox explained "[b]ecause the record does not reveal the extent to which the Respondent's failure to make required contributions to the fund since January 1, 2020, affected the fund's ability to cover its obligations to former unit employees who retired prior to that date . . . it [is] appropriate to reserve for compliance[.]" *Id.*

## SUMMARY OF THE ARGUMENT

The Board's committed reversible error because its Decision was not supported by substantial evidence in the record and contained errors in its application of governing law. <u>See</u> *infra* Sections I., II., II. The Board, through its adoption of the ALJ's conclusions of fact and law, committed error that this Court must overturn or remand for review in three ways: (1) The Board ignored substantial and uncontradicted evidence showing economic exigency requiring Rite Aid to Implement its Final Proposal; (2) The Board's determination that there was no valid impasse was not supported by substantial evidence and is incorrect as a matter of law; (3) the Board Improperly Determined the Remedies Imposed on Rite Aid Under the Law. *Id.*

## STANDARD OF REVIEW

Although the Board is, in general, entitled to deference, the Court will not affirm Board decisions that are not supported by substantial evidence, nor will it affirm decisions where the Board has applied the law incorrectly. *See Jackson Hosp. Corp. v. NLRB*, 647 F.3d 1137, 1142 (D.C. Cir. 2011) (vacating Board decision because it was not supported by substantial evidence). In that regard, this Court has noted that it will not uphold an order of the Board when it has "erred in applying established law to the facts of the case." *Jochims v. NLRB*, 480 F.3d 1161, 1167 (D.C. Cir. 2007). Additionally, "a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Moreover, the Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack Sales Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998). "ALJ witness credibility determinations are not immune from judicial scrutiny and must be reasonable and reasonably explained." *Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 484 (D.C. Cir. 2020) (relying on *Stanford Hosp. & Clinics v. NLRB*, 325 F.3d 334, 337 (D.C. Cir. 2003)).

## **ARGUMENT**

### I.    The ALJ Ignored Substantial and Uncontradicted Evidence Showing Economic Exigency Requiring Rite Aid to Implement its Final Proposal.

This Court has explained that although an employer may not unilaterally impose material changes without first negotiating to impasse, "[t]here are two exceptions to this general rule: An employer may impose unilateral terms *if the union engages in dilatory tactics to delay bargaining* and an employer may act unilaterally if faced with an economic exigency justifying the change." *Vincent Indus. Plastics, Inc.*, 209 F.3d 727, 734 (D.C. Cir. 2000) (emphasis added). Both occurred here. The Court further explained the exigency must be caused by "external events" beyond "the employer's control or was not reasonably foreseeable." *Id.* The employer had no control over the economic status of the Fund which was weeks away from collapse at the time that of impasse.  (JA434-38).

This Court also highlighted that the Board properly finds economic exigency "when, in response to one party's diligent and earnest efforts to engage in bargaining,' the other party 'insists on continually avoiding or delaying bargaining.'" *Serramonte Oldsmobile v. NLRB*, 86 F.3d 227, 235 (1996) (quoting *M&M Bldg. & Elec. Contractors, Inc.,* 262 N.L.R.B. 1472 (1982)); *accord International Ass'n of Fire Fighters,* 304 N.L.R.B. 401, 402 (1991). As discussed in detail below, Rite Aid made genuine efforts to engage in bargaining despite the Union continuously avoiding bargaining efforts doing so consciously to

37

exacerbate the fiscal crisis of the Fund. (See JA103-04, 116, 133, 546, 558 –

Pierson-Scheinberg; JA199). Furthermore, here, the facts support a finding that the

Union engaged in delay and that the fiscal status of the Fund was beyond Rite Aid's

control. See *infra* Sections I.a., I.b.

> **a.    The Board Failed to Consider Overwhelming Evidence that there was Economic Exigency at the time of implementation of the change in health insurance.**

In the instant case, the Board relied on *Bottom Line Enterprises*, 302 NLRB

3373 (1991) and *RBE Electronics*, 320 NLRB 80 (1995) in determining that there

was no economic exigency. (JA016). The Board's analysis was incorrect based on

law and fact. In *RBE Electronics of S.D., Inc., and District Lodge No. 5,*

*International Association of Machinists and Aerospace Workers, AFL-CIO,* 320

NLRB 80, 81 (1995), the Board expounded upon *Bottom Line* and explained:

> *The Board in Bottom Line recognized two limited exceptions to that general rule: when a union engages in tactics designed to delay bargaining and "when economic exigencies compel prompt action."*

> The "economic exigency" exception set forth in *Bottom Line* derives from the Supreme Court's decision in *NLRB v. Katz,* 369 U.S. 736, 748 (1962)[.] Although those decisions essentially condemn piecemeal bargaining, they provide support for the view that there might be some circumstances justifying or excusing an employer's taking action while bargaining is ongoing. These circumstances were described [] as involving "extenuating circumstances" and a "compelling business justification."

(emphasis added). In the instant case, economic exigencies required prompt action.

(See JA434-38).

38

Before the December negotiations, the Fund's reserves had dwindled from $3.2 million to $1.2 million, only covering 0.7 months, about 2-3 weeks of coverage for over 3,000 employees. (*Compare* JA404-08 and JA434-38). This undoubtedly constituted extenuating circumstances and a compelling business justification creating economic exigency. *See id.* In the instant case, the Fund's imminent bankruptcy and the potential risk of over 3,000 employees losing health care created the exact type of economic exigency that permitted unilateral action. *See, e.g.*, *Saint-Gobain Abrasives, Inc.,* 343 NLRB 542 (2004) (ALJ found that pending cancellation of the health plan by the insurer triggered an economic exigency).

The ALJ, and by adoption, the Board omitted these critical facts in its analysis, even though it came through a witness called by the General Counsel and undisputed evidence by her employer, Segal. (*See* SA023; A632 - Liang). As Segal consultant Liang explained, once the reserves were exhausted, which looked to be rapidly approaching, the Fund would have no "money available to pay for benefits." (JA616 - Liang). The result would have been that over 3,000 Rite Aid's associates would be left with no health insurance. The ALJ and the Board likewise ignored Liang's testimony that the Fund's downward trend would lead to it not having "any money left." (JA628 - Liang). Indeed, Liang confirmed in starkly similar language that this was an "economic exigency" when she conveyed that the Fund was in "an emergency" because it "was running out of money." (J419-24, Section 5A; JA630

- Liang).   In summary, the ALJ ignored substantial undisputed evidence of the

Fund's precarious financial situation in December 2019 prior to impasse, including

regular Board meeting minutes and reports that showed the continued decline of

Fund reserves, with *less than a month* of reserves available at that time.

In *Saint-Gobain Abrasives, Inc.,* 343 NLRB 542, 556 (2004) the Board further

highlighted:

> In *R.B.E. Electronics of S.D.*, . . . the Board extended *Bottom Line* to
> hold that, where an employer is confronted with an economic exigency
> that compels prompt action short of the type that would relieve it of its
> obligation to bargain entirely, that employer will satisfy its statutory
> obligation by providing the union with adequate notice and an
> opportunity to bargain. Once it does so, the employer is permitted to act
> unilaterally if the union fails to act promptly to request bargaining or if
> the parties, after good faith bargaining, reach an impasse on the exigent
> issue.

On December 20, 2019, Rite Aid informed the Union by letter that the Parties

were at impasse and that it planned to implement its final offer on January 1, 2020.

(JA160-66).  Following the impasse declaration, the Parties corresponded about the

declaration (*Id.*), but the Union made no further requests to meet, proposals or

attempts to break the impasse.  (JA586 - Pierson-Scheinberg).  Therefore, Rite Aid

implemented its offer on January 1, 2020.  (JA471 - Heise).   Again, the Board failed

to consider these facts although Rite Aid provided the Union with adequate notice

which empowered Rite Aid to act unilaterally. *Saint-Gobain Abrasives, Inc.,* 343

NLRB 542 (2004). Therefore, the Board's decision is not supported by substantial evidence, and it was arbitrary and contrary to law.

> **b.     The Record Shows the Union Participated in Dilatory Acts to Delay Bargaining and to Exacerbate the Exigency.**

Here, the Board and the ALJ failed to consider whether the admitted actions of the union constitute dilatory tactics, as discussed in *Vincent Indus. Plastics, Inc.* and *Serramonte Oldsmobile* despite the fact that the record is replete with evidence of the union attempting to delay negotiations. See *Vincent Indus. Plastics, Inc.*, 209 F.3d at 734 (2000); see also *Serramonte Oldsmobile v. NLRB*, 86 F.3d at 235 (1996).

The record contains the following undisputed facts:

- The Union delayed negotiations when it took more than three weeks to schedule the first bargaining session after Rite Aid ensured its availability. (JA103-04).

- After the May 2018 bargaining session took place, Rite Aid did not hear from the Union for three (3) months. (JA546 - Pierson-Scheinberg).

- After agreeing to meet in September 2018, all of the Union's bargaining team (except for its spokesperson) failed to show up and attended a golf tournament instead. (JA546 - Pierson-Scheinberg; JA199).

- After the November 2018 bargaining session, the Union went silent for five (5) months until the Parties exchanged NLRA Section 8(d) notices in April 2019. (JA 554 - Pierson-Scheinberg).

41

- The Union arrived at the December 5, 2029 meeting (well over a year into bargaining) without a proposal on health insurance. (JA580 - Pierson-Scheinberg; JA467 - Heise; JA511 - Stemerman; JA309).

- At six of ten sessions, the Union either failed to make a health care proposal or simply rejected Rite Aid's proposal to move coverage to a Rite Aid sponsored plan.

(See JA103-04, 116, 133, 546, 558 - Pierson-Scheinberg; JA199). The Board and ALJ ignored these facts. The Court should consider these actions as a whole as a factual predicate justifying the implementation of unilateral changes in the terms and conditions of employment. See *In re M & M Bldg. & Electrical Contractors, Inc.,* 262 N.L.R.B. 1472 (1982) (relying on *AAA Motor Lines, Inc.*, 215 NLRB 793 (1974)). This Court has established it will not affirm Board decisions that are incorrect in law or in fact, which is the case here. *See Jackson Hosp. Corp. v. NLRB*, 647 F.3d at 1142 (2011).

## II.    The Board's Determination That There Was No Valid Impasse Was Not Supported by Substantial Evidence and is Incorrect as a Matter of Law.

### a.    The Board Improperly Applied the Elements of Impasse to the Undisputed Facts and Misapplied the law.

The D.C. Circuit has held that the Board should find an impasse if there is "no realistic possibility that continuation of discussions would have been fruitful." *Laurel Bay Health & Rehab Ctr. v. NLRB*, 666 F.3d 1365, 1374 (D.C. Cir. 2012)

(citation omitted).  In *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1114 (D.C. Cir. 2001)

the D.C Circuit held that:

> For an impasse to be found, the parties must "have reached 'that point
> of time in negotiations *when [they] are warranted in assuming that
> further bargaining would be futile.'*" Whether the parties have reached
> this point is a case-specific inquiry; "there is no fixed definition of an
> impasse or deadlock which can be applied mechanically to all factual
> situations." Among the factors that the Board considers in evaluating
> the existence of an impasse are "the bargaining history, the good faith
> of the parties in negotiations, the length of the negotiations, the
> importance of the issue or issues as to which there is disagreement,
> [and] the contemporaneous understanding of the parties as to the state
> of negotiations." [These factors are recognized as the "Taft factors."
> [*See Taft Broad. Co.*, 163 N.L.R.B. 475, 478 (1967).] *After weighing
> these factors, the Board will find an impasse if there is "no realistic
> possibility that continuation of discussions ... would have been
> fruitful."*

(emphasis added); *See also Laurel Bay*, 666 F.3d at 1374.

Here, there was no realistic possibility that further discussions would have

been fruitful. (JA319; JA526).  There is a single statement that proves this point.

Stemerman's statement on December 5 that the Union had "given up on" addressing

the long term viability of the Fund, is an admission that the Union *would not ever

satisfy Rite Aid's requirement that* the Fund sustain itself to continue to provide

benefits.

The evidence is undisputed that Rite Aid articulated its goals as early as the

first meeting between the parties in May 2018, more than a year and a half prior to

impasse.  (JA542).  Rite Aid's two primary goals were (1) to ensure the long-term

43

viability of the Fund and (2) to require cost neutrality in any agreement because of Rite Aid's increased costs and need to make pay increases in Northern California. (*Id.*). Substantial evidence in the record reflects that any further negotiations would have been futile towards the established goals. Therefore, the record shows that the parties had reached a valid impasse. <u>See</u> discussion *infra* at pp. 43-48.

In this regard, the conclusion of the ALJ that Rite Aid had somehow not disclosed its specific month reserve requirement of six months to the Union as a basis for concluding that Rite Aid lacked impasse was irrelevant to the status of bargaining on December 5. <u>See</u> *supra* Section D. Even if Rite Aid had announced a lesser reserve requirement, the Union would not have met it.

1. **The Board Improperly Applied the Law and Improperly Considered the Facts in the Record in its Application to the Taft Factors.**

Among the factors that the Board considers in evaluating the existence of an impasse are:

(1) the Parties' bargaining history;
(2) the good faith of the parties in negotiations;
(3) the length of the negotiations; the importance of the issues of disagreement; and
(4) the contemporaneous understanding of the parties on the state of negotiations.

*Taft*, 163 NLRB at 478. All *Taft* factors do not have to reach a specific standard for impasse to occur. *Id.* However, in the instant case, the record contains substantial undisputed evidence that the *Taft* factors support a finding of impasse.

44

The ALJ's decision, adopted by the Board, improperly applied the facts to a number of *Taft* factors. Compare *supra* Section D, *Taft*, 163 NLRB at 478. For example, the ALJ failed to consider while "[t]here is no magic number of meetings, hours and weeks [] will reliably determine when an impasse has occurred" in general, the longer the parties have negotiated without reaching agreement, the more likely the Board will find a valid impasse. *The Finley Hospital*, 362 NLRB No. 102 (2015). Rite Aid bargained with the Union for over eighteen months and at ten negotiation sessions, where the Union refused to consider any Rite Aid proposal. (*See, e.g.*, JA213; JA262; JA388-401; JA243; JA291; JA137-39). The Board and this Court has regularly found lawful impasse in cases involving shorter periods of bargaining. *See Phillips 66*, 369 NLRB No. 13 (2020) (finding impasse when the parties met eleven times over months); *Prentice-Hall, Inc.,* 306 NLRB 31, 40-41 (1992) (lawful impasse declared after eight bargaining sessions over five months); *CalMat Co*., 331 NLRB 1084 (2000) (lawful impasse declared after ten bargaining sessions over seven months); *Laurel Bay*, 666 F.3d at 1374-75 (finding impasse where, after six months of negotiations, the parties remained as far apart as ever on single critical issue).

Despite this precedent, the ALJ found that the length of negotiations supported a finding that the parties were not at impasse. (JA012-013). In support of this finding, he relied on what he characterized as the "limited duration of the

relevant negotiations" between the Parties. (*Id.*). Additionally, the ALJ blatantly ignored substantial facts when he found that the parties met to negotiate for a successor collective-bargaining agreement seven times during 2019. *Supra* at Section D.2. All Parties *stipulated* that the Parties "met in collective bargaining" on *ten* dates between May 22, 2018 and December 5, 2019 (JA088, ¶ 3). And the facts show that the Parties bargained continually during this entire period over the single critical issue: healthcare coverage under the Fund. (*See*, *e.g.*, JA190-323). Therefore, the ALJ clearly misapplied the undisputed facts in his analysis. Importantly, the ALJ failed completely to consider the fact that the Union came to many sessions unprepared and then refused to discuss Rite Aid's health care proposal or its parameters for continued participation in the Fund.

The Board also failed to consider the principle established in *NLRB v. Cauthorne*, 691 F.2d 1023, 1026 n.5 (D.C. Cir. 1982) that "[a]n employer's adamant insistence on pro-management terms does not alone demonstrate bad faith, and . . . neither side is required to agree to a proposal or make concessions." Additionally in *NLRB v. McClatchy Newspapers, Inc.,* 964 F.2d 1153, 1174-75 (D.C. Cir. 1992), the Court explained:

> When an employer and a union, after bargaining in good faith, reach an impasse in their negotiations, the employer is generally entitled to implement unilaterally its final proposals on mandatory subjects of bargaining. That is so, the Board explains, because "the employer's duty to bargain over proposed changes does not imply a duty to agree to the union's counterproposals or to make a concession" and "does not

give the union a right to veto the proposed changes by withholding
consent."

(Internal citations omitted). In *McClatchy Newspapers,* this Court further discussed
"[a]s section 8(d) plainly states, the duty to bargain 'does not compel either party to
agree to a proposal or require the making of a concession.'" (relying on 29 U.S.C. §
158(d) (1988)).  Therefore, contrary to the ALJ's reasoning Rite Aid was not
required to make concessions.

In *Mike-Sell's Potato Chip Co. v. Nat'l Labor Relations Bd.*, 807 F.3d 318,
323 (D.C. Cir. 2015), this Court further explained:

> we recently held in *TruServ* and *Laurel Bay* that if an employer
> maintains a firm position, and has made clear that acceptance of its
> position on particular issues is essential to agreement, a union's last
> minute movement, short of agreement, will not avoid an impasse.

<u>See</u> *Laurel Bay Health,* 666 F.3d at 1374; *TruServ,* 254 F.3d at 1114.  *This is exactly
what happened here.*  Facing Rite Aid's statement at the end of the November 2019
meeting that the Parties were at impasse, and after threating to escalate already
undertaken economic action against the Company, the Union's proposal on
December 5, and its corresponding requests for information are classic last-minute
attempts to avoid an impasse.  <u>See </u>discussion *supra* at Section D.2.

Lastly, the ALJ's credibility determination was inherently incorrect and
cannot be upheld by this Court.  *See Circus Casinos, Inc. v. NLRB*, 961 F.3d 469,
484-85 (2020).  In *Circus Casinos, Inc.,* this Court explained "although our standard

47

sets a high bar, ALJ witness credibility determinations are not immune from judicial scrutiny and must be reasonable and reasonably explained." *Id.* at 485 (relying on *Stanford Hosp. & Clinics*, 325 F.3d 334, 337 (D.C. Cir. 2003)). Furthermore, this Court explained:

> Our review is not a rubber stamp, and case law reflects at least three grounds that may render an ALJ's credibility decisions unreasonable. This court will not condone arbitrary resolutions that reflect a "lack of evenhandedness." Nor will we uphold credibility decisions resting "explicitly on a mistaken notion." When drawing inferences for and against witness testimony, an ALJ "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands."

*Id.* (internal citations omitted).

Here, the Board's decision "lack[ed] evenhandedness." See *id.* The Board ignored numerous facts in arriving at its determination that Pierson-Scheinberg made or implied comments that the Union's December 5 proposal made "significant movement." (See SA017, JA583). The ALJs refusal to credit Pierson-Scheinberg is in direct contradiction to his rulings crediting her testimony elsewhere.[10] See discussion *supra* Section D.2.

---

[10] For example, similar to Pierson-Scheinberg's testimony, that the fund only had "2.2 months left of reserves and that their expenses were exceeding their income," (JA540 - Pierson-Scheinberg), the ALJ highlighted the "Fund expenses are expected to exceed income." (JA004). In another example of the ALJ's reliance on testimony and evidence submitted by Pierson-Scheinberg, the ALJ relied on Rite Aid's notes to determine that during the parties October 25, 2019 bargaining session, the meeting was contentious and filled with threats from the Union. (JA007). Although the ALJ

In addition to Pierson-Scheinberg's testimony, Kaitlyn Lavaroni testified that she never witnessed Pierson-Scheinberg make any statements or show conduct acquiescing to the Union's proposal.  (JA583, 644). The ALJ completely ignored this evidence.  See *supra* Section D.2.   On multiple occasions this Court has remanded cases where the Board has improperly applied the law or veered away from the facts.  See *ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1446 (D.C. Cir. 1997) (declining to enforce and remanding the Board's decision because its determination was not supported by substantial evidence in the record); *Erie Brush & Mfg. Corp. v. Nat'l Labor Relations Bd.,* 700 F.3d 17, 24 (D.C. Cir. 2012) (finding that substantial evidenced reflected the parties were lawfully at impasse and the Board incorrectly determined Petitioner violated the Act); *Mail Contractors of Am.,* 514 F.3d at 34–36 (explaining Board's finding that employer committed ULP by unilaterally implementing change after impasse "was arbitrary and capricious");  *Comau, Inc. v. Nat'l Labor Relations Bd.*, 671 F.3d 1232 (D.C. Cir. 2012)(vacating Board's finding that Petitioner committed a ULP by unilaterally changing its employees' healthcare benefits because the decision was arbitrary and not based on substantial evidence). For these reasons, the ALJ's decision was fundamentally incorrect, and this Court cannot uphold its decision.

---

found Pierson-Scheinberg and Rite Aid reliable in these instances, interestingly, he did not find her testimony reliable here.

**III.    The Board Improperly Determined the Remedies Imposed on Rite Aid Under the Law.**

The Board actively and substantially altered the ALJ's decision on Remedy. *Thrifty Payless, Inc*, 371 NLRB 124 at 1 fn2.  The Remedy Order of the Board and the ALJ are improper under the law.  See *Grondorf, Field, Black & Co. v. NLRB*, 107 F.3d 882, 888 (D.C. Cir. 1997).  This Court has explained "questions regarding remedies can be resolved during the Board's compliance proceedings." *Bob's Tire Co. v. NLRB*, 980 F.3d 147, 151 (2020) (relying on *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984)).

There was *NO* evidence as to remedy at the Hearing.  See generally *supra* at Section D.4.  Neither Counsel for the General Counsel nor the Union offered any evidence as to remedy, and there is a reason for that. *Id.*  By the time of the hearing, in late 2021, the Fund had not been functioning for months, and Rite Aid's associates had been covered by the Rite Aid Plan since January 1, 2021.  (JA160-66).  Whether and to what extent the Fund could even restart, with appropriate coverage or stop loss are questions that *NO PARTY* presented evidence on, and the ALJ and the Board, simply had no basis to order anything other than a make-whole remedy and leave the rest to the compliance process. *Supra* at Section D.4.

In the underlying Decision, the Board revised multiple portions of the ALJ's Remedy.  See discussion *supra* Section D.4.

In *Grondorf, Field, Black & Co.*, 107 F.3d at 888, petitioners challenged the Board's order requiring them to make "all contributions to the union pension and health and welfare funds that have not been paid since the strike." According to the Petitioners, the Board's order was punitive because employees were covered under employer-sponsored health and retirement plans that provided comparable benefits. *Id.* The Court agreed with the Petitioners. *Id.* This Court explained:

> While the Board has broad discretion to fashion appropriate orders to alleviate the effects of unfair labor practices, *its orders must be remedial, not punitive.* Where an employer unlawfully ceases contributions to a union benefit fund, the Board, with court approval, generally requires the employer to make up the contributions. *Courts have recognized, however, that if an employer has provided employees with alternative benefits, reimbursement is inappropriate to the extent that it "fails to benefit the employees" and "results in a windfall for the union funds."*

*Id.* (internal citations omitted) (emphasis added). Although the Court agreed with the Board that Petitioners must make employees whole, the Court clarified that Petitioners "should be allowed to demonstrate . . . that their contributions to the union plans must be reduced to avoid an improper windfall for those plans." *Id.* Ultimately the Court held "[o]n remand, the companies should have an opportunity to make that demonstration to the Board." *Id.*

The same analysis should be applied here. In the instant case, it is undisputed that the current Remedy would result in a "windfall" contribution to the Union. <u>Compare</u> *supra* Section D.4, *Id.* The Board determined Rite Aid shall "make all

51

delinquent contributions to the fund, including any additional amounts due to the fund on behalf of unit employees [and] reimburse unit employees for any expenses ensuing from its failure to make required fund contributions, with interest . . . compounded daily[.]" *Id.* Additionally, it is undisputed that since Rite Aid implemented its final offer on January 1, 2020, (JA160-66), over 3,000 employees have been provided with healthcare with comparable benefits as their prior plans. (See JA541).

In *Grondorf,* the Court explained "if an employer has provided employees with alternative benefits, reimbursement is inappropriate to the extent that it 'fails to benefit the employees' and 'results in a windfall for the union funds.'" *Id.* Since the Union's implementation of its proposal in January 2020 the 3,000 employees who were at risk for losing healthcare have received coverage under the Rite Aid health care. (JA160-66). Therefore, the remedy should be adjusted accordingly.

As discussed, this Court has relied on the established principle that "compliance proceedings provide the appropriate forum where the Board and petitioners will be able to offer concrete evidence." *Sure-Tan, Inc. v. NLRB,* 467 U.S. at 902 (1984). Although Rite Aid's position is that enforcement of the Board's decision should be denied and remanded for the aforementioned reasons, in the alternative, the Court should remand this matter to compliance to properly adjust the Board's improper Remedy.

52

## **CONCLUSION**

The underlying analysis of the facts and law is fatally flawed. Contrary to the Board's decision, a valid impasse existed, and economic exigency empowered the Petitioner to unilaterally implement its last proposal to prevent over 3,000 employees losing their healthcare because of the pending depletion of the Fund. The Fund respectfully asks that this Court grant its Petition for Review, deny the Board's Cross-Petition for Enforcement of the Board's Order, and remand the case to the Board for reconsideration.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, I certify that this Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this Brief contains 12,011 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared using Times New Roman 14-point font, a proportionately spaced typeface.

Respectfully submitted this 18th day of May 2023.

*/s/ Stephen M. Silvestri*
Stephen M. Silvestri (Bar No. 55749)
Alana R. Glover (Bar No. 64534)
JACKSON LEWIS P.C.
2800 Quarry Lake Drive
Suite 200
Baltimore, MD 21209
Tel: (410) 415-2000
Stephen.Silvestri@jacksonlewis.com

*Attorney for Petitioner Thrifty*
*Payless, Inc. d/b/a Rite Aid*

54

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2023 I electronically filed the foregoing Brief of Petitioner via the Court's e-filing system, which will serve a copy on the following:

Ruth E. Burdick
appellatecourt@nlrb.gov
Milakshmi V. Rajapakse
milakshmi.rajapakse@nlrb.gov
Jared D. Cantor
jared.cantor@nlrb.gov
Jill H. Coffman
National Labor Relations Board
Appellate and Supreme Court Litigation Branch
1015 Half Street, SE
Washington D.C. 20570

Richard Treadwell, Esq.
rtreadwell@msh.law
McCracken, Stemerman & Holsberry, LLP
475 14th Street, Suite 1200
Oakland, CA 94612


*/s/ Stephen M. Silvestri*
Stephen M. Silvestri (Bar No. 55749)